IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| David Stevenson Boyd, II, ) | |
| ) | Civil Action No. 6:12-1039-TMC |
| Plaintiff, ) | |
| ) | **OPINION & ORDER** |
| v. ) | |
| ) | |
| David William Weiner, ) | |
| ) | |
| Defendant. ) | |
| ) | |

The plaintiff, David Stevenson Boyd, II ("Boyd"), originally brought this action against the Greenville County Sheriff's Department, Greenville County, several John Doe defendants, and David William Weiner ("Weiner"), alleging both state and federal causes of action arising out of his arrest in 2008. After over a year of litigation, all that remains is Boyd's excessive force claim against Weiner. Weiner has moved for summary judgment in his favor on that claim. (ECF No. 33.) The parties have fully briefed that motion and the court heard oral argument on the relevant issues on December 12, 2013. After considerable review, the court finds that it must deny Weiner's motion for summary judgment.

**I. Facts**

Around noon on December 10, 2008, an alert went out to law enforcement that an armed bank robbery had just occurred at the Bank of Travelers Rest on White Horse Road. Weiner and another investigator, Mike Fortner ("Fortner"), were nearby and responded to the alert. As they were driving to the bank, they learned that the suspect was driving a white van with red smoke coming out of the windows. A Good Samaritan was following the van and transmitting information to dispatch. Weiner and Fortner followed directions from dispatch to pursue the suspect. As they turned on to Emile Street, dispatch reported that the Good Samaritan had been

1

shot. Weiner and Fortner saw the white van on the side of the road and the victim's pickup truck a short distance away. Fortner checked the van while Weiner administered first aid to the victim.

The victim told Weiner that the suspect was a black male wearing dark clothes and that he had shot him in the neck and run into the woods. By this time, other units had arrived on scene. Weiner and the other officers set up a perimeter and began combing the woods for the suspect.

Throughout the day, Weiner learned more about the robbery and the suspect. Weiner knew that while the suspect was in the bank, he had a black handgun and that the van he was driving had been stolen that morning. According to Weiner's supplemental incident report, the suspect was described as a black male, approximately six feet tall, slender build, wearing a dark hooded sweatshirt, dark jeans with some sort of white spots, black shoes, and a dark colored bandana. Other incident reports indicate that the bank surveillance video showed the suspect wearing a baseball cap and gray gloves. One report describes the pattern on the suspect's jeans as a bleached out area across the saddle area with some type of red linear design on the back and white linear design on the side. Another report describes the jeans as light blue jeans that faded to a lighter color toward the inner thigh. These reports are from officers who responded to the bank and viewed the surveillance video. However, it is unclear exactly what description the officers in the field received.[1]

Weiner searched the woods in the rain with the other officers until around 4:15p.m., when the perimeter was called off. During the search, a canine unit found a dark bandana, but there was no other sign of the suspect or his gun.

---

[1] With the exception of Boyd's affidavit, the evidentiary record before the court consists of testimony from various witnesses at Boyd's criminal trial and numerous incident reports. It appears that the parties have not engaged in any discovery specific to the issues of this civil suit.

Weiner removed his SWAT vest so that he was only wearing his SWAT uniform – a green uniform with a green and black sheriff's office patch on the front of the shirt.  On their way back to the station, Weiner and Fortner responded to a report of a suspicious person on Crane Avenue, only a couple of blocks from where Weiner had just finished his search and 1.6 miles from the Bank of Travelers Rest.  Nearly four hours had passed since the robbery, it was beginning to get dark, and it was still raining.  When Weiner and Fortner turned onto Crane Avenue, they saw Boyd crossing the street.  Weiner describes Boyd as wearing a long sleeve black shirt, jeans with white spots on them, and black shoes.  Both he and Fortner say that Boyd looked exhausted and was soaked to the bone.  According to Boyd, he was wearing a long sleeve gray t-shirt, blue jeans, and black boots.

Boyd saw a news truck coming down Crane Avenue, followed by Weiner's unmarked police car – a white Ford Taurus.  After the white car drove past him, it turned around quickly and came back toward him.  Weiner did not turn on the lights or sirens and Boyd contends that he could not identify the car as a police vehicle.  To escape the approaching car, Boyd ran into the nearest yard and jumped a fence.  In pursuit, Weiner drove his car into the yard and through the fence's gate.  Boyd scaled another fence and the two officers followed on foot.

Here, the factual accounts begin to differ significantly.  In Boyd's version, he continues to run, jumps another fence, and lands on the other side in a squatting position with his back to the fence and Weiner.  Then, as he's standing up to continue running, Weiner shoots him three times.

On the other hand, Weiner asserts that after Boyd jumped the second fence, he turned and faced Weiner.  Weiner could see that Boyd's hands were empty and interpreted this as Boyd getting ready to give up.  Fortner returned to the car and Weiner got ready to jump the fence to

3

take Boyd into custody. But, Boyd continued running and jumped the third fence. According to Weiner, when Boyd landed on the other side of the third fence, he turned his head and looked at Weiner. Boyd's hands were in front of him where Weiner could not see them. Weiner thought Boyd could still have the gun he used in the robbery and that he was getting ready to stand his ground. To protect himself, and possibly others in the area, Weiner shot Boyd. Also, Weiner claims that while he and Fortner were chasing Boyd, they were both identifying themselves as officers and ordering Boyd to stop. However, Boyd does not state in his affidavit whether or not he heard the two officers call out to him.

What is known for sure is that Weiner shot Boyd three times – in the back of his left elbow, below his left butt cheek, and below his left knee – and that Boyd was unarmed at the time.[2]

## II. Legal Standard

Summary judgment is warranted if the pleadings, discovery, and any affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether summary judgment is appropriate, the court views the facts and inferences in the light most favorable to the non-moving party, and the moving party carries the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

---

[2] After a full trial in 2012, a jury found Boyd guilty of assault and battery with intent to kill, armed robbery and possession of a weapon during the commission of a violent crime, and possessing or receiving stolen goods. *See South Carolina v. David Stevenson Boyd, II*, 2009 GS 2309988 (Greenville Cnty. Gen. Sessions Jan. 13, 2012). The fact of Boyd's subsequent conviction and the serious nature of his crimes makes this case especially difficult, however, as dictated by the legal precedents cited below, allowing that finding to influence this decision would be impermissible hindsight. Accordingly, the court will consider only those facts known to the parties at the time of the use of force.

### III. Analysis

In his motion, Weiner asserts that summary judgment is appropriate because: (1) he used reasonable force to effectuate a lawful arrest and acted within the bounds of the Fourth Amendment; (2) he is entitled to qualified immunity; and (3) the United States Supreme Court's holding in *Heck v. Humphrey* precludes the court from considering Boyd's claims.

    *A.*    *The Fourth Amendment & Qualified Immunity*

Generally, government officials performing discretionary functions are granted qualified immunity and, thus, are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). "For the purpose of determining whether a defendant is entitled to qualified immunity the plaintiff's rights must be clearly established under the particular circumstances confronting the official at the time of the questioned action." *Slattery v. Rizzo*, 939 F.2d 213, 216 (1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Id.* (emphasis in original).

The Fourth Amendment, including its reasonableness standard, governs all claims that law enforcement officers used excessive force in executing an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether a degree of force is reasonable is measured "by a standard of objective reasonableness." *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). Under that standard, courts must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397.

5

Properly determining objective reasonableness requires courts to give "careful attention to the facts and circumstances of each particular case." *Id.* at 396. This fact-intensive inquiry turns on the "totality of the circumstances," *Young v. Prince George's Cnty.*, 355 F.3d 751, 757 (4th Cir. 2004), including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the officer or others, and (3) whether the suspect was attempting to resist or evade arrest, *Graham*, 490 U.S. at 396.

The Fourth Circuit has applied the analysis above to a wide range of factual scenarios with differing results. *See, e.g., Pena v. Porter*, 316 Fed. Appx. 303 (4th Cir. March 13, 2009) (unpublished) (affirming the district court's denial of summary judgment where officers shot a man through the door of his trailer and the parties disputed the facts surrounding the shooting); *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir. 1996) (finding amount of force reasonable where, after giving multiple orders to drop the weapon, officers shot and killed a drunk driving suspect handcuffed in the police car pointing a handgun at them); *Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991) (affirming jury verdict for an officer who shot passenger in vehicle after observing him engaged in illegal sex act, he ignored orders to place his hands in view, and reached for a cylindrical object); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (granting qualified immunity to officer who shot suspect in a drug sting operation who refused multiple orders to put his hands up, appeared to have a possible weapon in one hand, and turned toward the officer as if to confront him where officer was wearing a bullet-proof vest, fluorescent arm-band, and mask over his face – all of which had "Police" clearly written on them – and another officer on the scene was able to verify the sequence of events). While each of these cases offers the court some guidance, each is necessarily limited to its facts.

Importantly, one fact all of these cases share, along with all of the other cases the court has reviewed in preparing this order, is that the officer who used force in executing an arrest either personally witnessed the arrestee commit a crime or was in the midst of an escalating confrontation at an active crime scene. In other words, the arresting officer had a sound basis for seizing that particular person.

In this case, the link between Boyd and the crimes Weiner arrested him for is tenuous at best. The robbery and shooting of the witness had occurred four hours earlier and Weiner, having not personally viewed the bank's surveillance video,[3] was relying on a general description of the suspect that essentially amounted to "a black male in patterned jeans and a hooded sweatshirt." In addition, the arrest took place toward the end of the workday when a tired person walking down the street in the rain could just as easily be walking home from a bus stop as evading police.

In addition, the disputed facts of the shooting preclude summary judgment. Viewing the facts in the light most favorable to Boyd, as the court must on a motion for summary judgment, *see George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009), the court cannot say that Weiner's actions were objectively reasonable. According to Boyd, he did not know that the two men pursuing him were with the sheriff's office and he never turned to face Weiner. Assuming the validity of these facts, Weiner used deadly force to prevent the escape of an unarmed, nondangerous suspect, thus acting unreasonably and violating Boyd's clearly established Fourth Amendment rights. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

---

[3] During oral argument on this motion, Weiner's attorney referenced Weiner having viewed the surveillance video and referred the court to exhibit 12 to Boyd's response. The court has thoroughly reviewed that exhibit and finds only one reference to the surveillance video – in response to a question about whether Weiner thought or knew Boyd was armed, Weiner states, "I knew he was. Not only did I have bank surveillance showing me, but he had actually shot someone." (ECF No. 41, Exhibit 12, Testimony of David Weiner, 465: 21-25.) Without further evidence, the court does not interpret this testimony to mean that Weiner personally viewed the tape.

Accordingly, the court cannot grant Weiner qualified immunity and must deny his motion for summary judgment.

    B.    *Heck v. Humphrey*

Weiner also asserts that "[t]o the extent [Boyd] seeks damages for alleged constitutional violations stemming from his criminal arrest, prosecution, and/or sentence," this action is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that a § 1983 action cannot lie where the plaintiff seeks to recover damages for "allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid." *Id.* at 487.

The court finds that *Heck* is inapplicable to this case. Here, Boyd has not challenged a single element of any of the offenses for which he was convicted.[4] The jury did not convict Boyd based on the reasonableness of Weiner's actions in effectuating his arrest – the sole question currently before the court. And, as stated above, whether Boyd actually robbed a bank, possessed a gun while robbing the bank, or shot someone is immaterial to this court's inquiry. Accordingly, *Heck* does not bar this action because a judgment in favor of Boyd in this case would not render his conviction or sentence invalid.

### IV. Conclusion

The court is sensitive to the split-second decisions required of police officers in the field. However, applying legal precedent to the factual record in this case, the court must deny Weiner's motion for summary judgment (ECF No. 33).

**IT IS SO ORDERED**.

                                              s/Timothy M. Cain

---

[4] Further, Boyd's second, third, fourth, and fifth causes of action, as well as all defendants other than Weiner, have been dismissed. So, the only claim Boyd is asserting is a claim of excessive force relating to his arrest. (ECF No. 21.)

                                  United States District Judge

January 13, 2014
Anderson, South Carolina

9